Zobel, J.
Having heard the testimony and viewed the exhibits while presiding over the jury-tried portions of these proceedings; having heard oral argument by the parties’ respective attorneys; and having examined their written submissions, I make the following findings pertinent to Plaintiffs’ claims for (a) imposition of a constructive trust (Count XI) and (b) rescission (Count XII), based on a preponderance of the credible evidence and such reasonable inferences as I chose to draw therefrom. Although the record may contain evidence contrary to one or another finding, I have considered such evidence, but given it no credit.
It is not inappropriate for me to preface my formal Findings of Fact by noting that this litigation, like so many family disputes, has tended to encourage all the Adelson parties to display deplorable rancor, bad feelings, and loutish behavior. The evidence during the 14-day trial depicted, like something from the playwright Arthur Miller, a harsh, demanding, unfeeling, successful businessman frustrated in his inability to actuate his self-indulgent, substance-abusing, over-pampered, and (as he believes) ungrateful sons.
In reaching this conclusion, I have clearly in mind the testimony and demeanor of the sons. I found them, as witnesses, not credible. The father did not testily “live”; Plaintiffs did not call him, Mass.R.Civ.P. 43(b); nor did any other party put him on the stand. Nonetheless, the evidence as a whole, as well as his demeanor while in my direct observation, communicated the flavor of his paternal — one might accurately say, patriarchal — attitude. The evidence did not, however, persuade me that he violated any legal, equitable, or ethical duty to Plaintiffs.
1. Defendant Sheldon Adelson (“Sheldon”) adopted Plaintiffs Gary Irwin Adelson (“Gary") and Mitchell Evan Adelson (“Mitchell”) and their sister Shelley Adelson (“Shelley”) when they were young, after he married their mother. Shelly participated in the transaction at issue but did not join in this lawsuit.
2. Mitchell, born August 28, 1957, attended Northeastern University for three years, taking various business courses, including accounting and economics; was graduated from Curry College cum laude in 1990; and received a Master’s Degree in clinical social work from Boston College in 1993. Sheldon bore the entire cost of Mitchell’s education.
3. Gary, born September 11, 1954, was graduated from Lesley College in 1994, after taking business courses at Boston College, Northeastern University, and Suffolk University. Sheldon bore the entire cost of Gary’s education.
4. The law firm of Hill & Barlow (his present counsel) represented him in various domestic and real estate matters during the 1990s. It was his practice to have *172 a lawyer review agreements and contracts before signing them.
5. At all times pertinent to the issues in this action, Sheldon either directly supported Mitchell and Gary or furnished them assets which provided their financial support.
6. In 1988, Sheldon sponsored a trust arrangement which conferred on Mitchell, Gary, and Shelly an ownership interest in an office building in Needham, Massachusetts. The rental income which the building generates provides each of the children with an annual income of $100,000 to $125,000. Upon eventual sale of the building, Mitchell and Gary can each reasonably expect to net $6,000,000.
7. Until 1994, Mitchell and Gary each received $20,000 (the maximum tax free gift) from Sheldon and his first wife or Sheldon and his second wife.
8. Mitchell purchased a house for $549,000, using $499,999 in gifts which Sheldon orchestrated and $50,000 from a loan which Sheldon either made directly or arranged.
9. Sheldon also paid the balance of the mortgage on Gary’s condominium and gave Gary (as a gift) funds to buy his first residence.
10. Throughout the events at issue here, Sheldon owned a 50.001% interest in The Interface Group, Inc. (“Interface"), which was primarily concerned with trade shows and travel.
11. In 1988, Interface purchased 15% of its own stock from a retiring shareholder, Richard Katzeff (“Katzeff’).
12. On or about June 1, 1989, Interface transferred the 15,000 shares of its stock formerly owned by Katzeff to the children (“younger stockholders”) of its then-existing stockholders, Sheldon Adelson, Theodore (“Ted”) Cutler, Irwin Chafetz and Jordan Shapiro (“older stockholders”), at $265 per share, in percentages reflecting the ownership of their respective fathers.
13. The younger stockholders signed 10-day demand notes payable to Interface for amounts equal to $264.99 per share (“the Purchase Notes”), identical in terms (except for the amount payable, which varied proportionally with the amount of stock purchased), interest at an adjustable rate.
14. Each of the three Adelson children received 2,941.24 shares of stock. The evidence permits the inference, which I draw, and the finding, which I make, that none of them expected ever to have to make any payment on the promissory notes (unless or until an event like the sale of their stock).
15. From the date of acquisition through November 10, 1994, when they sold the stock back to Sheldon in the transaction which underlies this litigation, neither Gary nor Mitchell ever received any demand for either interest or principal; nor did either of them make any such.
16. The evidence permits the inference, which I draw, and the finding, which I make, that Mitchell and Gary regarded their respective shares as gifts. Although the evidence permits a contrary inference, I decline to draw it; and I do not credit such evidence.
17. Before the Adelson children received the stock, Sheldon desired to divide his allocation of the Katzeff stock between his children and his three siblings, a desire which, as majority stockholder, he could have enforced.
18. However, after consulting the other older shareholders, Sheldon conditioned this distribution on his children’s agreeing to share with Sheldon’s siblings half of any proceeds resulting from any future sale, a condition to which Gary and Mitchell agreed, and as to which they signed a Memorandum of Understanding to reflect and memorialize their agreement. (All the Adelson children participated on identical terms. Because Shelly is not party to the present litigation, we need not refer to her hereafter.)
19. On November 1, 1989, the younger stockholders executed a Voting Trust Agreement (Charles For-man, Voting Trustee) and deposited their shares of Interface stock into the voting trust, receiving in return certificates of beneficial interest (“Voting Trust Certificates”) in the Voting Trust. Mitchell and Gary knew that Forman was Interface’s counsel and that he worked for Sheldon.
20. On November 1, 1989, Mitchell and Gary created, respectively, the Mitchell Adelson Trust and the Gary Adelson Trust, to hold Mitchell’s and Gary’s respective Voting Trust Certificates. Mitchell and For-man were named co-trustees of the Mitchell Adelson Trust; Gary and Charles were named co-trustees of the Gary Adelson Trust. Mitchell and Gary were also beneficiaries of their respective trusts. Other beneficiaries were Mitchell and Gary’s respective issue (born and unborn).
21. Mitchell and Gary did not object to Forman’s serving as their respective co-trustee.
22. In December 1989, the Interface Group, Inc. was reorganized into two separate successor corporations, Interface Group-Nevada, Inc. (“Interface-Nevada”), a Nevada Corporation, and Interface Group-Massachusetts, Inc. (“Interface-Mass.”), a Massachusetts corporation, each with 100,000 shares. Each share of The Interface Group, Inc. converted to one share of Interface-Nevada and one share of Interface-Mass.
23. After the reorganization, the two successor corporations continued to share administrative functions and to issue combined financial statements.
24. Interface elected to be taxed as a Subchapter S corporation in 1982.
*173 25. In April 1988, the older stockholders formed a Nevada corporation, Las Vegas Sands, Inc. (“LVSI”), to acquire the Sands Hotel and Casino in Las Vegas. The younger stockholders had no ownership interest in LVSI.
26. Thereafter, in 1989 and 1990, Interface entered into loan agreements with third-party lenders, the proceeds of which were used for LVSI. The loan agreements limited the ability of Interface to pay dividends or distributions to its stockholders.
27. Interface made no distributions between June 1, 1989 and November 29, 1994 except amounts equal to the income tax liability of the respective Interface stockholders attributable to the taxable income of Interface, applying maximum effective tax rates.
28. Interface’s primary goal was erection of a private convention center to expand the Comdex Trade Show, a massive computer-industry trade ejqpo.
29. From 1991 to 1993 Interface conducted discussions with several possible purchasers of Interface’s largest asset, the Comdex Trade Show, none of which produced any accepted offer or purchase and sale agreement. Indeed no interested party conducted any “due diligence,” i.e., detailed inquiry into Interface/Comdex.
30. The older generation minority stockholders expressed to Sheldon a desire, given the then-favorable market conditions and premier status of Comdex, to sell the show. At least one such shareholder, Irwin Chafetz (“Chafetz”), wanted to sell Comdex because he was concerned about keeping all of Interface’s capital in a single asset. He expounded the vulnerability of a one-product company and argued that selling Comdex would assure the older generation stockholders and their families financial security.
31. Sheldon spurned Chafetz’s entreaties, although he agreed that Chafetz to scout the range of whatever offers might be available.
32. Interface received no firm offers for Comdex, nor even any tentative ones before November 10, 1994.
33. In 1993, the Blenheim Company (“Blenheim”) had proposed to purchase the interests of the three minority shareholders and their children, representing 41% of the company (but not the Adelson children’s shares). Although the older generation shareholders were willing to sell, Sheldon refused his assent.
34. The refusal upset Chafetz who believed, correctly, that Blenheim was providing the only market for a minority position in the company.
35. After the Blenheim negotiations ended in late 1993, Chafetz proposed that Sheldon buy out his interest, and that of the other older generation shareholders, in Interface and its related companies (including LVSI), as well as their children’s interests in Interface, for $84,000,000: $30,000,000 each to Chafetz and Cutler and their children, $24,000,000 to and his children. Sheldon refused.
36. At the Comdex Show in November 1993, Sheldon met Masayoshi Son, president of Softbank Corporation (“Softbank”), who communicated a desire to own Comdex.
37. To an inquiry about his cash resources, Son replied that he did not have the money. Sheldon told Son to come back when he had remedied that lack. In light of Son’s and Softbank’s position in the entrepreneurial world, the exchange permits the inference, which I draw, and the finding, which I make, that Son’s response was not literally true, but merely represented a long-range negotiating posture.
38. Given Son’s attitude, neither man mentioned a possible price; nor did Sheldon furnish Son (or Softbank) any revenue or income information.
39. The tone of the meeting was sufficiently informal that neither Sheldon nor the other Interface representatives present took any of Son’s statements seriously; they all regarded the exchange as (at most) a humorous prelude to the distant possibility of further exploration.
40. Although the parties exchanged routine confidentiality agreements after their meeting, neither Sheldon nor anyone else connected with Interface furnished Son or his people with any other materials pertaining to a prospective sale of Comdex until November 14, 1994.
41. Prior to October 20, 1994, Interface representatives learned that the Ziff-Davis company was for sale. Ziff-Davis owned one of the largest trade publications in the country and controlled some trade shows which were becoming competitive with Interface.
42. Interface submitted a bid of approximately $65,000,000 to buy the Ziff-Davis trade show division, which Ziff-Davis rejected (a) because it was too low; and (b) because at that time Ziff-Davis preferred not to sever its trade show division from its publishing division.
43. Interface learned that Softbank was also bidding for Ziff-Davis. This ignited Sheldon’s interest because, were Softbank to absorb Ziff-Davis and its trade show division, Interface, which was seeking to acquire additional trade shows, might be able to purchase that division from Softbank. Alternatively, Sheldon wanted to explore the possibility of managing the trade show portion for Son, inexperienced in the trade show business.
44. The possibility of such diversification appealed to Sheldon, who wanted Interface to broaden its interests in the trade show business, thus putting itself in position to penetrate additional types of markets. Interface directors had been concerned about the risks inherent in becoming a one-product company (see, Finding 30, supra).
*174 45. On October 20, 1994 Chafetz and Forman met in New York City with Son and his advisor, Theodore Dolotta, to discuss Interface’s interest in buying the trade show portion of any Ziff-Davis acquisition that Son might achieve. At Son’s suggestion, the parties agreed to defer further discussion until Son in fact acquired Ziff-Davis.
46. Never, during the October 20, 1994 meeting, did the participants discuss Softbank’s interest in acquiring Comdex.
47. In November 1994, by which time Softbank had acquired the Ziff-Davis trade show, Sheldon and his associates met Son again for the purpose, they believed, of continuing the October discussions. William Lohse, the person responsible for running the ZiffDavis trade shows, was present. This permits the inference, which I draw, and the finding, which I make, that the agenda (at least as far as Sheldon and Interface were concerned) centered on the possibility of Softbank’s selling Interface the former Ziff-Davis trade show division.
48. Son opened the meeting, however, by declaring himself in a buying mode. That is, rather than selling shows to Interface, he wanted to discuss the possibility of buying Comdex.
49. Sheldon indicated a willingness to explore this possibility, but only after the parties signed confidentiality agreements.
50. Asked how much he was willing to offer, Son expressed a disinclination to discuss a price until he examined Comdex’s financial statements. The parties agreed to furnish each other pertinent information and to meet again in January or February 1995.
51. At that point, Son had not yet determined to pursue Comdex, because he was still interested in purchasing the part of Ziff-Davis which he did not already own. As he put it, when he heard the rumor that Ziff-Davis was for sale, his dream of acquiring Comdex became secondary.
52. Although Son had agreed to purchase the trade show division of Ziff-Davis in late October 1994, his top priority at the time of the November 1994 meeting at Comdex was still to acquire Ziff-Davis publishing, which had already been sold to another bidder; he wished to conserve his funds for with an eye to that purchase.
53. In this atmosphere, the parties at the November 1994 meeting did not mention any specific dollar amounts. They did not sign confidentiality agreements until December 1994; nor did Interface contact its investment banker, Goldman Sachs, about the Comdex transaction until January 1995. More significantly, Softbank did not commence “due diligence,” i.e., satisfying itself as to the bonaJides of InterfaceComdex and the validity of the factual and fiscal representations.
54. The matter came to fruition somewhat suddenly at a meeting in New York City in January 1995, with the parties’ respective investment bankers in attendance. It was here that Son made his first dollar offer; the Interface-Comdex group had not previously indicated an asking price.
55. At this point, Son and Sheldon left the meeting room and privately negotiated the sale.
56. It is necessary at this juncture to backtrack. In May 1994 Interface and the firm of Bear Stearns prepared a confidential Private Placement Memorandum concerning Interface’s proposed $125,000,000 refinancing, the proceeds designated to pay existing debts and to cover anticipated expenditures.
57. In July 1994 Interface and Bear Stearns issued the final Private Placement Memorandum.
58. On October 26, 1994, Interface, paying between $4,000,000 and $5,000,000 in investment banking fees, borrowed $125 million under the terms of a Note Purchase Agreement and refinanced (i.e., paid off) prior loans due November 30, 1994.
59. The new loan carried a seven-year term and an interest rate higher than if Interface had obtained a six-month loan.
60. Interface could have closed on the new loan at any time up to November 30, 1994.
61. As it happened, the sale of Comdex in early 1995, which generated cash to prepay the refinancing, in turn caused Interface to incur penalties of between $4,000,000 and $5,000,000. This permits the inference, which I draw, and the finding, which I make, that had the sale of Comdex to Softbank been in Sheldon’s contemplation at the time of the refinancing, Interface would not have gone forward, but would instead have obtained a bridge loan (i.e., a temporary loan) until the Comdex sale finalized.
62. The bridge loan scenario would have saved Interface about $10,000,000 in investment banking fees and prepayment penalties. This permits the inference, which I draw, and the finding, which I make, that Sheldon, whose attention to matters financial permeated (and continues to permeate) his life, would not have incurred such a significant loss.
63. The evidence permits the inference, which I draw, and the finding, which I make, that if, at the time of the refinancing, any Interface executive, particularly the fiscally-astute Sheldon, believed — or even thought — that in November Son would initiate negotiations for purchasing Comdex, the Interface cadre not only could but would have waited until the deadline closing date (November 30) before closing the loan, thus allowing time for the Comdex discussions to percolate and possibly mature.
64. At around the time of the refinancing, during a trip to London in October 1994, Sheldon told Mitchell that he had long been trying to sell Interface but that he had not received any appropriate offers.
*175 65. Saying that he would like to give the children an opportunity to sell him their stock Sheldon asked Mitchell to convey this thought to Gary and Shelley.
66. Mitchell was aware that other companies had offered to purchase Comdex; Sheldon had, for example, told him about Blenheim’s $650,000,000 proposal and Interface’s rejection of the price and terms.
67. Mitchell knew that Sheldon’s partners were eager to sell Comdex and that they “wanted out” because of safety and security concerns. Mitchell did not know, but I find as a fact that on November 10, 1994 Chafetz would have sold his stock and that of his children to Sheldon at the same price Sheldon ultimately paid Mitchell and Gary; a lack of funds prevented his buying his own children’s stock.
68. Sheldon told Mitchell that although a possibility existed that the company might one day be sold, only the sale to Sheldon would guarantee the children an ascertainable price for their holdings. I find that this was not a misrepresentation. The evidence permits the inference, which I draw, and the finding, which I make, that Sheldon, considerably wiser and more sophisticated in business matters than any of the children, was not motivated by anything other than a desire to assure his children a definite (and, indeed, substantial) return on their holdings — for which, see Finding, supra, they had essentially paid nothing, and which, to that point, had not generated any distributions beyond annual amounts to cover tax liability arising from the children’s respective aliquot share of corporate income.
69. In this conversation, Sheldon told Mitchell, in words or substance, that each child could sell or not, as she or he pleased.
70. The evidence permits the inference, which I draw, and the finding, which I make, that Sheldon had scant regard for his sons’ ability to earn a living. In making this finding, I have in mind that Sheldon was aware of Mitchell’s psychological difficulties, prior history of substance abuse, and dependence on Sheldon for substantial financial assistance (either direct or by way of nepotistic employment) during his adult years. I have also in mind that Sheldon was aware of Gaiy’s psychological difficulties, prior history of substance abuse, and insubstantial work record. .
71. Sheldon wished to provide his children a steady stream of current income and a later lump sum to protect them against business uncertainties and what he perceived to be their own business and personal weaknesses.
72. Sheldon believed that neither Mitchell nor Gary could support himself or his family. I find that to have been a reasonable belief. Sheldon wished to ensure the availability of ample funds to permit his sons a comfortable, even slightly opulent lifestyle.
73. To accomplish his ends, Sheldon had caused the creation of a trust for each of his sons and their respective issue. Forman and Mitchell were the trustees of Mitchell’s trust; Forman and Gary were the trustees of Gary’s trust. In November 1994, each trust’s sole asset was the Interface stock which Sheldon had offered to purchase, stock which was then producing only tax-payment income (see Finding, supra).
74. The transaction which Sheldon proposed would, as Mitchell and Gary both realized, convert non-productive, market-lacking paper holdings into a note which would furnish each of them a $210,000 annual income. Put another way, by selling their stock, Mitchell and Gary assured themselves of “earning” $575 a day for merely waking up. Beyond that, in ten years, when the notes came due, each of them would receive $3,000,000.
75. Neither Mitchell nor Gary inquired of anyone about Interface’s financial prospects or earnings, although they could have obtained knowledge as to Interface’s earnings merely by reviewing their own income tax returns, which indicated their respective attributed profits. These in turn, by simple multiplication, would have disclosed Interface’s profits.
76. The evidence permits the inference, which I draw, and the finding, which I make, that whatever their weaknesses, both 40-year-old Mitchell and 37-year -old Gary were fully capable ofunderstanding that whatever information about Interface they wished to acquire was theirs for the asking — if they chose to ask. The evidence permits the further inference, which I also draw, and the finding, which I make, that they were fully capable of understanding the significance of any such information.
77. Sheldon did not in any way conceal information from his sons; nor did he mislead them by inappropriate silence or half-truths.
78. On November 10, 1994, Sheldon purchased each of his children’s certificates of beneficial interest in Interface for $5,298,879.
79. The purchase price included (as to each child):
a. Sheldon’s 10-year note for $3,070,000, with interest of $210,000 payable semi-annually;
b. Forgiveness of the Purchase Note (Finding 13, supra);
c. Sheldon’s assumption of the obligation to his siblings, upon payment by the child of $660,000 to those siblings.
80. The arrangements with respect to Sheldon’s siblings saved Mitchell and Gary $1,000,000 each.
81. In the paperwork which this transaction required, independent counsel (not Forman) represented Sheldon. The nature of the sons’ respective trusts required each to request Forman, the co-trustee, to distribute to them the Interface stock, so they could transfer it to Sheldon.
*176 82. Sheldon advised Mitchell to retain an attorney. When Mitchell declined to do so, Sheldon told him he could consult one whenever he wished. The evidence permits the inference, which I draw, and the finding, which I make, that although Sheldon at this time had little direct contact with Gary, he reasonably believed that Mitchell was keeping Gary informed of everything he heard from Sheldon. The evidence permits the further inference, which I draw, and the finding, which I make, that Gary knew of Sheldon’s advice concerning legal representation and chose not to follow it.
83. Neither Mitchell nor Gary was in anyway, or by any person, pressured either into accepting Sheldon’s offer or into signing the necessary papers. Each had ample time and opportunity to consider the offer, to make suitable inquiries, to gather necessary information, and to obtain outside counsel; in short, to perform “due diligence.” To the extent that either son failed to do so, or to read what was put before him, that decision was entirely the son’s own. However, the evidence permits the inference, which I draw, and the finding, which I make, that even if the son had conducted “due diligence” and read everything carefully, he still would have signed freely and willingly.
84. The evidence permits the inference, which I draw, and the finding, which I make, that had the subsequent sale to Softbank not taken place, Mitchell and Gary would each have considered that he received advantageous treatment. Put another way, neither of them regarded himself as having any other grounds for complaint.
85. The evidence permits the inference, which I draw, and the finding, which I make, that at the time they sold their respective shares, both Mitchell and Gary would have been content with a price of $3,000,000 each, and that therefore each found the ultimate price ($5,300,000) entirely satisfactory.
86. The evidence permits the inference, which I draw, and the finding, which I make, that given what Mitchell and Gary knew at that time, or what on reasonable inquiry they (or anyone else) could have learned about the value of their shares, the transaction was, from their standpoint, fair, indeed, generous: they received a large amount of money in return for stock which had essentially cost them nothing to acquire and whose future value, as far as they, Sheldon, or anyone else could reasonably predict, was uncertain.
87. Stephen J. O’Connor, an Interface employee (and, since 1994, its Chief Financial Officer) annually prepared Mitchell’s and Gary’s tax returns at no cost to them.' He was available for them for questioning concerning the value of the stock; he would have fairly and honestly answered any questions on the topic.
88. O’Connor, holder of an MBA degree from Rutgers, assured himself that the price was fair. Sheldon had personally approved the higher figure, i.e., $5,300,000, but O’Connor was concerned that any part of the price which exceeded fair value might entail significant gift tax consequences.
89. The credible evidence is strong, and I find, that Mitchell and Gary were, for whatever reason, disinclined to ask questions of O’Connor or anybody else. I explicitly find, however, that this insouciance did not result from a belief that Sheldon (or anyone else) would look after their interests. I further find that neither Sheldon, Forman, nor anyone else took advantage of Mitchell’s or Gary’s state of mind.
90. Throughout the events leading up to and including sale of the stock, both Mitchell and Gary, as a co-trustee of their respective trusts, were aware of a fiduciary obligation to ensure that the stock was not sold or transferred for other than a fair or proper price.
91. Although after Mitchell and Gary sold their shares, Interface made certain so-called non-cash distributions, i.e., paper transactions, they played no role in the purchase adverse to the interest of either Mitchell, Gary, or their respective trusts. The evidence permits the inference, which I draw, and the finding, which I make, that even had Mitchell or Gary known (at the time of the sale) that the non-cash distributions were to occur, the information would not have caused either of them to retain his stock; the sale would have proceeded.
CONCLUSIONS OF LAW
1. Whether or not a judge hearing claims for imposition of a trust or rescission (both equitable remedies, not jury-triable as of right) is bound by the juiy’s answers to special questions on the simultaneously-tried common law claims, compare, MacCormack v. Boston Edison Co., 423 Mass. 652, 655n (1996); Dalis v. Buyer Advertising, Inc., 418 Mass. 220, 227 (1994), with Ravosa v. Zais, 40 Mass.App.Ct. 47, 54 (1996); Velleca v. Uniroyal Tire Co., 36 Mass.App.Ct. 247, 251 (1994), is immaterial to the current discussion because I have, as the foregoing findings demonstrate, agreed in all material respects with the jury’s conclusions.
2. Neither Defendant Adelson nor Defendant For-man committed, as to Plaintiffs, an unfair or deceptive practice.
3. Defendant Forman at all times performed his duties as trustee and as Defendant Adelson’s agent appropriately, ethically, and legally. He violated no fiduciary or other duly to either Plaintiff.
4. Defendant Adelson, although perhaps lacking paternal kindliness and, indeed, cordiality generally, did not mislead, cheat, or defraud Plaintiffs (or either of them). That he might have treated them more generously is irrelevant to the case at bar. He gave them their due; neither law nor equity requires more.
5. Defendant Adelson did not breach whatever fiduciary duty he may have owed Plaintiffs.
*177 6. Defendant Adelson did not conceal from Plaintiffs or either of them any fact material to their decision to sell the Interface stock.
7. Defendant Adelson did not misrepresent to Plaintiffs or either of them any fact material to their decision to sell the Interface stock.
8. Defendant Adelson did not fail to disclose to Plaintiffs or either of them any fact material to their decision to sell the Interface stock.
9. Neither Plaintiff is entitled to rescission of the sale of their respective Interface shares.
10. On the facts as found, Defendant Adelson did not take the Interface shares impressed with a constructive trust in favor of either Plaintiff.
ORDER
Accordingly, it is Ordered, that with respect to Plaintiffs’ claims for relief by way of a constructive trust (Count XI) or rescission (Count XII) judgment enter forthwith:
Complaint dismissed as to all Defendants, with prejudice.